IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| CALVIN EDWARD WEBB and | ) | |
| DIANE GROGAN WEBB, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 7:15-cv-00413 |
| | ) | |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| EQUIFIRST CORPORATION, *et al.,* | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Spouses Calvin Edward Webb and Diane Grogan Webb, proceeding pro se, filed two

substantially similar suits in state court, both seeking to stop foreclosure proceedings related to

their residence.  The Webbs, who had defaulted on their mortgage obligations, challenged their

loan closing and the subsequent securitization of their loan.  Both cases were removed to this

court, and the Webbs have not contested the propriety of the removal in either case.[1]  Upon

motion of some defendants, the court consolidated the two actions and the second, No. 7:15-cv-

423, was struck from the active docket of the court.  (Dkt. Nos. 9, 13.)[2]

Pending before the court are two motions to dismiss.  The first was filed jointly by two

defendants: U.S. Bank National Association, as Trustee for Structured Asset Securities

Corporation, Mortgage Pass-Through Certificates, Series 2006-EQ1 (U.S. Bank), and Mortgage

Electronic Registration Systems, Inc. (MERS).  The second was filed by defendant Aurora Loan

---

[1]  The cases were removed on the grounds of both diversity jurisdiction and because the plaintiffs have
asserted claims alleging violations of federal laws, *i.e.*, the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* (TILA),
and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.* (RESPA).  (Notice of Removal, No. 7:15-cv-
413, Dkt. No. 1; No. 7:15-cv-423, Dkt. No. 1.)

[2]  Unless otherwise noted, docket references are to electronic filings in the lead case, No. 7:15-cv-413.

Services, LLC (Aurora).[3]  These three defendants seek dismissal of all of the Webbs' claims

against them.  The motions have been fully briefed and are ripe for consideration.  For the reasons

set forth herein, the court will grant both motions to dismiss and dismiss all claims against these

defendants.

As to the remaining defendants, the court will direct the Webbs to show cause as to why

those defendants should not be dismissed because of the Webbs' failure to serve them timely.

## I.  BACKGROUND

The facts are taken from the two complaints and documents attached to them, *Zak v.

Chelsea Therapeutics Int'l, Ltd*., 780 F.3d 597, 606 (4th Cir. 2015).[4]  The court has also

considered certain exhibits referenced in the complaint and attached to the motions to dismiss,

since those documents are "integral to and explicitly relied on in the complaint," and there is no

challenge to their authenticity.  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc*., 637 F.3d

435, 448 (4th Cir. 2011) (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)).

For purposes of both motions to dismiss, the court accepts the complaint's well-pleaded factual

allegations as true and construes them in the light most favorable to the Webbs.  *Coleman v. Md.

Court of Appeals*, 626 F.3d 187, 189 (4th Cir. 2010).  And because the Webbs are pro se litigants,

this court also construes their pleadings liberally.  *See, e.g., Boag v. MacDougall*, 454 U.S. 364,

365 (1982) (citation omitted).  The court notes, though, that "[p]rinciples requiring generous

---

[3]  Aurora contends that it was not properly served, but it waives proper service and moves for dismissal instead.  (Aurora's Mem. Supp. Mot. Dismiss 3 n.3, Dkt. No. 26.)

[4]  The "complaint" in 7:15-cv-413, although titled a "Complaint for TRO, Injunction and for Declaratory Relief" and filed as a separate action in state court, does not contain specific counts.  (First Compl., Dkt. No. 8 at 29–41.)  It appears to be directed more toward supporting the Webbs' request for preliminary injunctive relief, which was denied by the state court.  (*See generally id.*; Dkt. No. 8 at 27 (order of Roanoke City circuit court denying motion for temporary restraining order).)  Nonetheless, its allegations are similar (or identical) to those set forth in the complaint originally filed in the second action removed.  (No. 7:15-cv-423, Dkt. No. 1-2 at 6–68.)  The court will treat both documents as a single complaint, but will cite to the one in No. 7:15-cv-413 as the "First Complaint" and the one in No. 7:15-cv-423 as the "Second Complaint."

2

construction of pro se complaints are not . . . without limits." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985) (affirming district court's dismissal of pro se complaint).

A.    **Factual Allegations**

On March 14, 2006, the Webbs executed an adjustable rate note ("the Note"), in favor of EquiFirst Corporation, in the amount of $340,000.  (Second Compl. ¶ 28, No. 7:15-cv-423, Dkt. No. 1-2; Note at 1, Ex. A to Defs.' Mem. Supp. Mot. Dismiss (Defs.' Mem.), Dkt. No. 12-1.)  As part of their obligations under the Note, the Webbs agreed to repay the amount borrowed, plus interest at a adjustable rate starting at 7.7%.  The Note also contains provisions stating that the Webbs understand that "the Lender may transfer the Note" and that "anyone who takes this Note by transfer and who is entitled to receive payments under the Note is called the Note Holder." (Note at 1.)

The Note was secured by a deed of trust ("Deed of Trust") for the property where the Webbs resided, 3617 Laurel Ridge Road, NW, in Roanoke, Virginia ("the Property").  (Deed of Trust, Ex. B to Defs.' Mem., Dkt. No. 12-2.)  As with any deed of trust under Virginia law, the Deed of Trust had a "grantor" (here, the Webbs), a "grantee" (here, MERS), and a trustee (here, Burton L. Albert).  *See Khair v. Countrywide Home Loans, Inc.*, No. 1:10-cv-410, 2010 WL 2486430, at *3 (E.D. Va. June 14, 2010) (discussing deeds of trust generally and citing Virginia Code §§ 55-58 and 55-59).  The Deed of Trust explicitly designates MERS as beneficiary and nominee for EquiFirst, the original lender.  (Deed of Trust 1–2, Dkt. No. 12-2.)  The Deed of Trust also contained a "Sale of Note" clause, which states that "[t]he Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower" and explains that a sale could result "in a change in the entity (known as the 'Loan Servicer') that" could collect payments due under the Note.  (Deed of Trust ¶ 20, Dkt. No. 12-2 at

3

12.)  The Deed of Trust and an adjustable rate rider signed by the Webbs were both recorded in the Roanoke City Circuit Court on March 20, 2006.  (Dkt. No. 12-2 at 19–20.)

According to the complaint, at some point after their closing, the Webbs' loan went through a securitization process, whereby it was grouped with other mortgage loans and sold to investors as a security.  The Webbs' Note was assigned by MERS to U.S. Bank, as trustee for a trust referred to as "Structured Assets Securities Corporation, Mortgage Pass-Through Certificates, Series 2006-EQ1."  (Second Compl. ¶¶ 6–21; *see also* Defs.' Mem. 7–8.)  The process by which any particular loan ends up being transferred to such a trust is governed by a contract known as a Pooling and Servicing Agreement (PSA).  (Second Compl. ¶ 19.)  The PSA and another contract called the Mortgage Loan Purchase Agreement (MLPA) govern the securitization transactions.  (*Id.*)

Although the complaint does not contain much detail on the foreclosure proceedings, the original state court records contain a recorded document titled a "Substitution of Trustee," dated January 6, 2015, in which U.S. Bank, as trustee for the trust, states that it is "either the original payee of the Promissory Note or the Promissory Note has been duly indorsed."  (No. 7:15-cv-423, Dkt. No. 1-2 at 47.)  The same document removes Albert as trustee and appoints instead Professional Foreclosure Corporation of Virginia as substitute trustee.  (*Id.*)  The document was executed by Wells Fargo Bank, N.A., as servicing agent to U.S. Bank, as trustee for the trust.  (*Id.*)  Based on this document, it appears that, at the time of foreclosure, Wells Fargo Bank, N.A., was the servicing agent for U.S. Bank as Trustee, the owner of the Note.  This is also consistent with correspondence sent from U.S. Bank to the Webbs in July 2014.  (*See* No. 7:15-cv-413, Dkt. No. 16-1 at 41.)

4

Based on the foreclosure proceedings, and other allegations in the complaint concerning the Webbs' inability to make their payments, it appears that the Webbs defaulted on their Note at some point. (*E.g.*, Second Compl. ¶ 48 (noting the Webbs could not afford the loan); ¶ 129 (describing the Webbs as "permanently burdened" by the loan).) Certainly, they do not allege that they have repaid their debt in full.[5] The reason for the default and the details of the foreclosure proceedings, however, are not explained in the complaint or elsewhere.

As described by the Webbs in their "introductory allegations," they "dispute[] the title and ownership of" the Property and allege that the originating mortgage lender and others alleging an ownership interest in the Note and Deed of Trust, "have unlawfully sold, assigned and/or transferred their ownership and security interest" and thus "do not have lawful ownership or a security interest" in the Property. (*Id.* ¶ 14.) They seek to quiet title on this basis. (*Id.*)

Their remaining claims are based "upon the facts and circumstances surrounding [the Webbs'] original loan transaction and subsequent securitization." (*Id.* ¶ 15.) The Webbs describe, as the "very basis" of their complaint, "that Defendants breached their PSA contract, and through misrepresentation are about to foreclose on [the Property], and that because of the securitization process Defendants and their predecessors in interest failed to properly assign [the Webbs'] mortgage note and Deed of Trust according to state law and the PSA governing the original loan." (First Compl. 10.) They point to a number of specific alleged "deficiencies" in the securitization process and posit that these "render invalid any security interest in [their] mortgage." (*Id.* at 8.) Among other things, these supposed deficiencies include the "splitting or separation of title," a

<hr>

[5] In a document Mr. Webb prepared and recorded, the Webbs purported to modify their earlier deed by simply stating that the prior Deed of Trust "erroneously set forth the amount of indebtedness secured" as \$340,000 and that the Deed of Trust should be modified "to correctly reflect the amount of indebtedness secured thereby to be zero dollars (\$0.00)." (No. 7:15-cv-423, Dkt. No. 1-2 at 39–40.) That document was not signed by anyone other than Mr. Webb and a notary. The Webbs do not cite to that document nor do they appear to rely on it. In any event, they have not pointed to any authority that would allow debtors to unilaterally erase their debts simply by recording such a "modification" signed only by them, and the court is unaware of any.

failure to properly assign the deed of trust, failures to record either the assignment or the default, and different failures to comply with the PSA and/or MLPA. (*Id.*) The court discusses each of these theories in more detail *infra* at Section II.B.

In addition to their challenges to the securitization process, the Webbs also allege, in general terms, that the defendants "intentionally concealed the negative implications of the loan they were offering" to the Webbs and now the Webbs have the "potential of losing their home to the very entities who placed them in this position." (*Id.* at 5.) They claim that the "terms of the finance transaction with EquiFirst" were illegal and that the loan was illegal, because the terms were not clear, conspicuous, or consistent. They also contend that the loan was underwritten without proper due diligence. In particular, they contend that the underwriter, Lehman Brothers, failed to verify the Webbs' income and that they should not have qualified for the loan in the first place.[6] (*Id.* at 5–6.)

## B.    Parties, Causes of Action, and Defendants' Motions to Dismiss

The complaint names as defendants EquiFirst Corporation (twice), U.S. Bank, Aurora, MERS, and "Does 1 through 100, Registration." The Webbs allege that each of the named defendants was a "purported participant in the imperfect securitization of the Note and/or the Deed of Trust." (Second Compl. ¶¶ 4-7). EquiFirst is also listed as the Lender on the note executed by the Webbs. (Note, Dkt. No. 12-1 at 1.) The Webbs further identify U.S. Bank as the

---

[6] In their opposition memorandum, the Webbs raise for the first time a new theory in which they claim they "did not default on the loan because the loan was never completed. EquiFirst was not the Lender, there was no notary present to verify signature and no lender present at the closing." (Pls.' Opp'n to Defs.' Mot. Dismiss 1, Dkt. No. 16.). The Webbs point to no authority to support their claim that a failure to have a notary present invalidates their Note or their Deed of Trust. *Cf. Davis v. Wells Fargo Bank, N.A.*, No. 3:13-cv-586, 2014 WL 106257, at *6 (E.D. Va. Jan. 8, 2014) (concluding that, because the Virginia Code does not require the notarization of deeds, even if a notarization was improper, a deed cannot be voided on that ground). In any event, these additional allegations are not contained in the complaint, except that there is a reference to EquiFirst not being the originator. (Second Compl. ¶ 75.) They also contradict other allegations in the complaints, as well as the documents attached to the complaint itself, which indicate both that EquiFirst was the lender, and that a notary signed the documents. Particularly in the absence of any motion to amend the complaint, the court will not consider those allegations further.

6

"purported Trustee for the Securitized Trust," (Second Compl. ¶ 5).[7]  The Webbs describe Aurora

as the "master servicer" for the securitized trust.  (*Id.* ¶¶ 5–6).  Defendant MERS is identified as

the "beneficiary under the Deed of Trust."  (*Id.* ¶ 7; *see also* Deed of Trust, Dkt. No. 12-2.)  The

complaint also names as defendants "Does 1 through 100," describing these defendants as

unknown entities who may claim "some right, title, or interest in the Property.  (*Id.* ¶ 9.)

    The complaint does not specify which claims are brought against which defendants;

instead, it names all the defendants in all of the following ten claims:

1. Lack of standing to foreclose;
2. Fraud in the concealment;
3. Fraud in the indictment;
4. Intentional infliction of emotional distress;
5. Quiet title;
6. Slander of title;
7. Declaratory relief;
8. Violations of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* (TILA);
9. Violations of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.* (RESPA); and
10. Rescission.

(Second Compl. at 1.)

    The Webbs filed suit days before to a threatened foreclosure sale and sought an injunction

prohibiting the sale.  The state court denied the request for injunctive relief, and the Webbs

acknowledge that the foreclosure sale has now occurred (*see, e.g.*, Pls.' Opp'n to Defs.' Mot.

Dismiss 2, Dkt. No. 16).  Defendants subsequently removed both cases to this court, and they

have been consolidated.

    As noted, there are two motions to dismiss pending.  In their motions, defendants argue

that the Webbs' claims fail for various reasons.  In the first motion, U.S. Bank and MERS assert a

---

[7] Elsewhere in the complaint, though, the Webbs refer to U.S. Bank as the master servicer for the securitized trust (Second Compl. ¶¶ 24–26), which is not only inconsistent with the primary allegations in the complaint identifying it as the trustee (*id.* at ¶ 5), but also apparently inaccurate.  (*See* Defs.' Mem. 3 n.3.)  In any event, U.S. Bank's role makes no difference to the court's analysis.

number of grounds for dismissal.  First, they argue that most of the Webbs' claims are based on challenges to the securitization process and that the Webbs do not have standing to raise those challenges.  (Defs.' Mem. 6–8, Dkt. No. 12.)  Second, they assert that there is no basis in law for the Webbs' argument that a "splitting" of the Note and Deed of Trust resulted in an imperfect security interest.  (*Id.* at 9–10.)  Third, they posit that the Webbs' complaint: (a)  fails to state a claim for quiet title (*id.* at 10–11); (b) fails to state any cognizable claim for fraud both because any such claim is time-barred and because it has not been pleaded with particularity (*id.* at 11–13); (c) fails to demonstrate a basis for injunctive or declaratory relief, both because the foreclosure has already occurred and because the Webbs have not pleaded sufficient facts to support the requests for relief (*id.* at 14–16); (d) erroneously suggests that foreclosure was precluded because EquiFirst failed to record a notice of default (*id.* at 16–17); and (e) fails to state any allegations in support of the claims under TILA,[8] or RESPA (*id.* at 17).[9]

Aurora's motion to dismiss echoes some of these arguments.  Aurora groups together counts 1 through 8 of the Webbs' complaint as being "premised on the theory that the note was not properly securitized or assigned."  (Mem. Supp. Aurora's Mot. to Dismiss 4, Dkt. No. 26.)  It contends that all of these counts fail because the Webbs do not have standing to challenge the PSA.  Second, Aurora claims that all the counts, including the two that do not implicate the PSA, should be dismissed for failure to comply with Rule 8.  (*Id.* at 3–4.)

---

[8]  Defendants do not reference the Home Owners and Equity Protection Act (HOEPA), nor do the Webbs list a violation of HOEPA as a separate count in the title of the complaint.  But the Webbs refer to the statute in the eighth cause of action, along with TILA, and elsewhere in the complaint. (Second Compl. ¶¶ 15, 124–133.)  "Congress enacted HOEPA in 1994 as an amendment to TILA [that] requires lenders to provide borrowers with additional disclosures with respect to certain home mortgages."  *Dash v. FirstPlus Home Loan Owner Tr. 1996-2*, 248 F. Supp. 2d 489, 505 (M.D.N.C. 2003) (citing 15 U.S.C. § 1639(a)(1)).  The court's analysis of the Webbs' TILA claim is applicable to their HOEPA claim, as well.

[9]  In addition to these reasons, Defendant MERS also contends that it is fraudulently joined and should be dismissed.  (Defs' Mem. 8-9.)  In light of the court's ruling that all of plaintiffs' claims are subject to dismissal, the court does not address this argument.

8

The Webbs have filed two memoranda in opposition to the U.S. Bank and MERS motion to dismiss, and one in response to Aurora's, all of which the court has considered.  (Dkt. Nos. 16, 21, 34.)[10]

The court concludes, however, that the vast majority of defendants' arguments are meritorious, as discussed below.  After setting forth the standards that govern the defendants' motions to dismiss, the court will discuss first the general legal theories underlying all (or nearly all) of the Webbs' claims and the overwhelming authority rejecting the same types of challenges to foreclosures based on these theories.  It will then turn to a brief examination of each of the specific counts and additional reasons why each is subject to dismissal.

## II.  DISCUSSION

### A.  Standard for Motions Under Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's allegations must "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This standard "requires the plaintiff to articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief, *i.e.*, the 'plausibility of entitlement to relief.'"  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).  The plausibility standard requires more than "a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.

### B.  Legal Theories Relied Upon By Plaintiff

As to the Webbs' claims that the securitization process had deficiencies that resulted in no interest in their property being transferred, they rely on theories that have repeatedly been rejected

---

[10]  In their response to the motion to dismiss, the Webbs attach a number of documents, although none of them are properly considered on a motion to dismiss and so the court does not consider them here.

by this court and others. The underlying theories the Webbs rely on are that: (1) securitization itself has somehow led to the defendants' lack of a legally enforceable interest in the Property; (2) the defendants failed to comply with the terms of the PSA and/or the MLPA; (3) the original Note has not been produced by any defendant and, therefore, no defendant has proved it is a holder with authority to demand payment or to foreclose; (4) the Note and Deed of Trust were "split" during the securitization process and thus the holder of the note does not have a perfected security interest; and (5) foreclosure was improper as a result of failures to record either the assignments of the Note or Deed, or the Webbs' default. As discussed below, none of these theories are legally sufficient to entitle the Webbs to the relief they seek.

### 1. The mere fact of securitization does not extinguish the Webbs' obligations under their Note.

The Webbs appear to contend that interests cannot be, or were not, transferred properly during the securitization process. (Second Compl. ¶¶ 14, 16–25; *see also* First Compl. 7 ("[I]f the Defendants, and each of them, did not hold and possess the Note on or before the closing date of the Trust herein, they are estopped and precluded from asserting any secured or unsecured claim in this case.").) But there is nothing inherent in securitization that alters the Webbs' obligations under their Note or prevents a purchaser of the Note from enforcing it. As explained by the court in *Upperman v. Deutsche Bank National Trust Co.*, No. 01:10-cv-149, 2010 WL 1610414, at *2 (E.D. Va. Apr. 16, 2010): "[t]here is no legal authority that the sale or pooling of investment interest in an underlying note can relieve borrowers of their mortgage obligations or extinguish a secured party's rights to foreclose on secured property." Judge Moon of this court quoted this same language in rejecting theories similar to those asserted here. *Blick v. JP Morgan Chase Bank, N.A.*, No. 3:12-cv-1, 2012 WL 1030115, at *5 (W.D. Va. Mar. 27, 2012), *aff'd*, 474 F. App'x 932 (4th Cir. 2012); *see also McFadden v. Fannie Mae*, No. 7:11-cv-335, 2012 WL 37169,

at *5 (W.D. Va. Jan. 9, 2012) ("[T]he Fourth Circuit has rejected the notion that the validity of a note or deed of trust is compromised by transfer to another party." (citing *Horvath v. Bank of N.Y., N.A.*, 641 F.3d 617, 619 (4th Cir. 2011)).

In their response to Aurora's motion to dismiss, the Webbs acknowledge that Virginia law does not "prohibit[] the securitization of the note or allow[] borrowers to escape their payment obligations as a result of securitization." (Pls.' Opp'n to Aurora's Mot. Dismiss 3, Dkt. No. 34.) But they argue that they "should have been told at the closing that their note would be securitized and they could [have] made the decision to accept the loan or not," and complain that they "were not given that choice." (*Id.*) They contend that because they were not informed that their loan would become part of a trust, there "was not a meeting of the minds." (*Id.* at 2.)

As Aurora points out in its reply, however, the Deed of Trust signed by the Webbs allows their Note to be sold to others without prior notice to them:

> The Note or partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.

(Deed of Trust ¶ 20, Dkt. No. 12-2 at 12.) Further, nothing about the securitization altered the terms of the Webbs' underlying obligations. So it is difficult to discern why any advance notice of securitization would have caused them not to accept the loan. In any event, based on the foregoing authority, the court concludes that the securitization here did not strip the holder of the Webb's Note of the right to foreclose, nor did it extinguish the Webbs' underlying obligations.

11

### 2. The Webbs do not have standing to challenge failures to comply with the PSA or the MLPA.

As to the Webbs' claims that there were breaches of the PSA or the MLPA, or that transfers were not made in compliance with those agreements, defendants correctly note that the Webbs do not have standing to challenge such breaches because they were not parties to either agreement. This is true under both Virginia law, which governs the foreclosure of the Property, and New York law, under which the trust here was allegedly created. *Wolf v. Fed. Nat'l Mortg. Ass'n*, 512 F. App'x 336, 342 (4th Cir. 2013) (affirming district court's ruling that mortgagor lacked standing to challenge the propriety of the assignment of her mortgage under Virginia law); *Bell v. Clarke*, No. 15-cv-1621, 2016 WL 1045959, at *2 (D. Md. Mar. 16, 2016) (collecting authority for the proposition that, under New York law, "a person cannot sue under a contract when that person is neither a party to nor a third-party beneficiary of the contract" and thus "mortgagors generally lack standing to attack transfers of their mortgages through assignments and PSAs to which they are not parties"); *Grenadier v. BWW Law Grp.*, No. 1:14-cv-827, 2015 WL 417839, at *4–5 (E.D. Va. Jan. 30, 2015) (holding that the mortgagor lacked standing to challenge the validity of any assignments of her note and deed of trust, and lacked standing to challenge any defects in the securitization process for the note); *Figueroa v. Deutsche Bank Nat'l Trust Co.*, No. 1:13-cv-592, 2013 U.S. Dist. LEXIS 180404, at *3–4 (E.D. Va. July 10, 2013), *aff'd*, 548 F. App'x 85 (4th Cir. 2013) (holding that a borrower, who is not a party to a PSA, "has no standing to challenge the defendants' compliance therewith").

The Webbs do not allege that they were parties to the MLPA that created the trust or the PSA that governed the trust. They also do not allege that they were third-party beneficiaries, nor could they, since the entities involved in the sale of the securitized mortgages did not engage in

those transactions to benefit the Webbs. For these reasons, claims based on purported violations of those agreements will be dismissed for lack of standing.

### 3. The Webbs' "show me the note" theory has no basis in Virginia law.

The Webbs also claim that no evidence exists to prove that the owner of the original note properly transferred or assigned it to any of the entities seeking to foreclose. According to them, therefore, the defendants lack standing to enforce the note. This is the same type of "show me the note" defense that other courts have rejected under Virginia law. Even if the note were actually and permanently lost, "[c]ourts have routinely rejected [this] theory," which "began circulating through courts across the country in 2009." *Gallant v. Deutsche Bank Nat'l Trust Co.*, 766 F. Supp. 2d 714, 720 (W.D. Va. 2011) (citing *Stein v. Chase Home Fin., LLC*, Civ. No. 09–1995, 2010 WL 4736828, at *3 (D. Minn. Aug. 13, 2010)).

In Virginia,

> [i]f a note or other evidence of indebtedness secured by a deed of trust is lost or for any reason cannot be produced . . . , the trustee may nonetheless proceed to sale, provided the beneficiary has given written notice to the person required to pay the instrument that the instrument is unavailable and a request for sale will be made of the trustee upon expiration of 14 days from the mailing of the notice.

*Gallant,* 766 F. Supp. 2d at 721 (quoting Virginia Code § 55–59.1(B)). Based on this statute, and just like the plaintiffs' claims in *Gallant*, the Webbs' claims alleging that the defendants lack "standing to enforce the Note" because they have been unable to produce a copy of it, are subject to dismissal. *Id.*; *Grenadier*, 2015 WL 417839, at *5 (holding that plaintiff's arguments based on defendants' alleged refusal to produce the original note before foreclosure "are not cognizable under Virginia law").[11]

---

[11] The Webbs complain that, absent a requirement that the proper documentation be produced, it is possible that multiple entities could seek to obtain payments on the note. But those are not the facts here. Nowhere do the Webbs allege that multiple entities claiming the same interest have sought payments from them.

**4.    The Webbs' theory that the note has been "split" and is thus unenforceable, is incorrect.**

The Webbs also argue that because securitization resulted in a "splitting or separation of title, ownership and interest in [Plaintiffs'] Note and Deed of Trust of which the original lender is the holder," a security interest was not properly transferred.  (Second Compl. ¶ 45(a).)  This court, and other federal district courts in Virginia, have flatly rejected this theory.  *See, e.g.*, *Wolf v. Fed. Nat'l Mortgage* Ass'n, 830 F. Supp. 2d 153, 162–63 (W.D. Va. 2011), *aff'd*, 512 F. App'x 336 (2013); *Tapia v. U.S. Bank, N.A.*, 718 F. Supp. 2d 689, 700–01 (E.D. Va. 2010).  *See also Martins v. BAC Home Loans Servicing, L.P.*, 722 F.3d 249, 255 (5th Cir. 2013) (rejecting the "split-the-note theory" and finding that an assignee of a deed of trust has authority to foreclose without physical possession of the note); *Horvath*, 641 F.3d at 624 (explaining that transferring a note does not "strip it from the security that gives it value" because to so hold would "render the note largely worthless").  There is no merit to the Webbs' theory regarding "splitting," and thus it cannot support their claims.

**5.    The failure to record does not preclude foreclosure in Virginia.**

The Webbs' contention that the defendants either have no interest in the property, or no ability to foreclose, because of a failure to record transfers of the Note or Deed of Trust, is not supported by the law.  Here, as in *Blick*,

> neither the note, nor the deed of trust, nor any Virginia law cited by [the Webbs] requires that assignments [or] transfers of such instruments be recorded in the county land records.  *See Daugherty v. Diment,* 385 S.E.2d 572, 574–75 (Va. 1989) (noting that the assignor was "not required to obtain the consent of anyone" when the subject contract included a clause specifying free assignability).

2012 WL 1030115, at *6; *see also Davis v. Wells Fargo Bank*, No. 3:13-cv-586, 2014 WL 106257, at *2–3 (E.D. Va. Jan. 8, 2014) (rejecting a similar argument and discussing Virginia

14

Code § 55-66.01, which allows an assignee of a debt or other obligation secured by a deed of trust, *at the assignee's option*, to record the instrument of assignment, but expressly states that "[n]othing in this statute shall imply that recordation of the instrument of assignment or a certificate of transfer is necessary in order to transfer to an assignee the benefit of the security").

Likewise, any assertion that foreclosure could not occur unless a default had been recorded finds no support under Virginia law. As numerous courts have noted in this context, Virginia operates under non-judicial foreclosure laws. That is, "[s]ections 55–59.1 through 55–59.4 [of the Virginia Code], which set forth the procedural requirements for a non-judicial foreclosure, do not require an interested party to prove 'standing' in a court of law before initiating the foreclosure process." *Gallant*, 766 F. Supp. 2d at 721 (quoting *Tapia*, 718 F. Supp. 2d 689, 698 (E.D. Va. 2010)). *Accord Grenadier*, 2015 WL 417839, at *5; *Davis*, 2014 WL 106257, at *2–3; *Blick,* 2012 WL 1030115, at *5. Accordingly, this theory cannot support any of the Webbs' claims either.

## C.    Specific Claims

For the foregoing reasons, as well as the additional reasons set forth below, each of the Webbs' claims is subject to dismissal.

### 1.  Lack of standing to foreclose (Count 1)

This "claim" is not really a separate legal claim, and it fails for all of the reasons discussed in Section B above. That is, none of the theories the Webbs rely upon to claim that the defendants lack standing to foreclose find any support in Virginia law. This claim will be dismissed.

### 2.  Fraud in the Concealment and Fraud in the Inducement (Counts 2 and 3)

Counts 2 and 3 allege different species of fraud claims. In order to adequately allege a fraud claim under Virginia law, a plaintiff must show: (1) a false representation, (2) of material

15

fact, (3) made intentionally and knowingly; (4) with intent to mislead, (5) reasonable reliance by the party misled, and (6) resulting damages to the party misled. *State Farm Mut. Auto. Ins. Co. v. Remley*, 618 S.E.2d 316, 321 (Va. 2005). Additionally, any claim alleging fraud must comply with Rule 9(b), which requires that the circumstances constituting fraud shall be stated with particularity. Fed. R. Civ. P. 9(b).

As an initial matter, even liberally construed, the complaint here fails to provide the defendants with adequate notice regarding which claim is alleged against which particular defendant. In their "fraud in the concealment" claim, the Webbs simply allege that "[d]efendants concealed the fact that the Loans were securitized as well as the terms of the Securitization Agreements." (Second Compl. ¶ 70.) They further assert that they would not have entered into the loan had "the truth" been disclosed. (*Id.* ¶ 71.)[12] They also claim that the note and deed of trust are fraudulent because EquiFirst was not the originator of the loan. (*Id.* ¶ 75.) Similarly, in their claim for fraud in the inducement, they claim that "defendants misrepresented that they were entitled to exercise the power of sale provision" and misrepresented that they were the "holder and owner" of the Note and the beneficiary of the Deed of Trust."[13]

---

[12] The Webbs' response to the motion to dismiss offers different (and more detailed) factual allegations in support of their fraud claims, although those allegations do not appear in the complaint. For example, they claim that they "were not informed they had an adjustable rate Mortgage." (Pls.' Opp'n to Defs.' Mot. Dismiss 9, Dkt. No. 16.) Elsewhere in their response, they claim that they were told on the good faith estimate their loan was a 7% fixed rate and not a pre-payment arm, and that "[w]hen [they] discovered this at closing, the broker entered the room and stated he guaranteed" them that, in two years they would be able to refinance. They were not able to refinance, however. (*Id.* at 7.) As noted, these allegations do not appear in their complaint. And even if the additional allegations were considered part of the complaint, the Webbs nonetheless fail to identify the name of the person who made such statements or which defendant he worked for. Thus, as discussed herein, then, they fail to allege fraud with particularity as required.

[13] These allegations supporting the fraud in the inducement claim appear to be based on statements made in connection with the foreclosure proceedings, long after their closing occurred. But the Webbs do not explain how they relied on these alleged representations to their detriment, nor how they were "induced" to enter into any agreement based on them. Indeed, the Webbs have fought the foreclosure proceedings. Further, although the Webbs allege these statements were "false," the court has rejected each of the theories offered in support of the alleged falsity.

The Webbs have failed to allege their claims for fraud with particularity as to each defendant. *See, e.g., Dealers Supply Co. v. Cheil Indus., Inc.*, 348 F. Supp. 2d 579, 590 (M.D.N.C. 2004) ("Courts have been quick to reject pleadings in which multiple defendants are lumped together and in which no defendant can determine from the complaint which of the alleged representations it is specifically charged with having made . . . .") (internal quotation marks and citations omitted). *See also Taylor v. Wells Fargo Bank, N.A.*, 85 F. Supp. 3d 63, 72–73 (D.D.C. 2015) (rejecting similar fraud claims where plaintiff failed to allege "which defendants made the misrepresentations").

The Webbs' complaint also fails to satisfy the heightened requirements set forth in Rule 9(b), and thus is subject to dismissal on this ground. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 n.5 (4th Cir. 1999) ("[L]ack of compliance with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule 12(b)(6)."). For example, the complaint does not allege who made any fraudulent statement, on behalf of which defendant, or when and where any such statement was made. *Id.* at 784 (explaining that Rule 9(b)'s heightened pleading standard requires a plaintiff to state with particularity "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby") (citations omitted). The claims containing a fraud element, therefore, are subject to dismissal on this basis.[14]

---

[14] There are likely additional reasons why the fraud claims fail, including that they are barred by the applicable two-year statute of limitations. (*See* Defs.' Mem. 11.) In light of the court's dismissal of these counts, it is not necessary to determine whether this affirmative defense is clear on the face of the complaint. *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc) (noting that unless "all facts necessary to the affirmative defense 'clearly appear[] *on the face of the complaint*,'" a court cannot reach the merits of an affirmative defense on a Rule 12(b)(6) motion because such a defense does not affect the legal sufficiency of a plaintiff's complaint) (alteration in original) (citations omitted).

### 3.  Intentional Infliction of Emotional Distress (Count 4)

To prevail on their intentional infliction of emotional distress claim, the Webbs must prove, by clear and convincing evidence, that: (1) "the wrongdoer's conduct is intentional or reckless," (2) "the conduct is outrageous and intolerable," (3) "the alleged wrongful conduct and emotional distress are causally connected," and (4) "the distress is severe." *Fuller v. Aliff*, 990 F. Supp. 2d 576, 580 (E.D. Va. 2013) (citing *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991)). Furthermore, intentional infliction of emotional distress claims are not favored under Virginia law. *Barrett*, 240 F.3d at 268.

The allegations by the Webbs here are insufficient to allege a plausible claim for intentional infliction of emotional distress.  First, although they allege that defendants' actions caused them severe emotional distress, they refer only to "lack of sleep, anxiety, and depression." (Compl. ¶ 95.)  These allegations do not allege a plausibility that they can satisfy the injury portion of this tort, which requires them to prove emotional injury "so severe that no reasonable person could be expected to endure it." *Russo*, 400 S.E.2d at 163; *Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427, 436 (4th Cir. 2006) (same).

Second, given that the Webbs' theories challenging defendants' ability to foreclose are not valid, the conduct that they are alleging is essentially that a defendant is foreclosing on their property.  While undergoing foreclosure on one's residence is understandably upsetting, foreclosure is a legal remedy available to the lender under the law and under the terms of the documents the Webbs signed.  It is not, therefore, the type of "severe and outrageous" conduct that would support an emotional distress claim. *Fuller*, 990 F. Supp. 2d at 580 (noting that, in emotional distress cases, liability "has been found only where the conduct has been so outrageous in character, and so outrageous in degree, as to go beyond all possible bounds of decency, and to

18

be regarded as atrocious, and utterly intolerable in a civilized community.") (quoting *Russo*, 400 S.E. 2d at 162); *Crittendon v. Arai Americas, Inc.*, No. 2:13-cv-567, 2014 WL 31490, at *6 (E.D. Va. Jan. 3, 2014) (dismissing intentional infliction of emotional distress claim and noting that the second prong, requiring outrageous and intolerable conduct, "is seldom met by plaintiffs under Virginia law"). Other courts have dismissed intentional infliction of emotional distress claims in this context. *See, e.g.*, *Grenadier*, 2015 WL 417839, at *10–11 (rejecting emotional distress claims based on similar allegations); *Taylor*, 85 F. Supp. 3d at 73–74 (collecting authority rejecting intentional infliction claims in same context).

For these reasons, Count 4 is subject to dismissal.

### 4. "Quiet Title," "Slander of Title," and "Declaratory Relief" claims (Counts 5, 6, and 7)

Like Count 1, the three claims in Counts 5, 6, and 7 all depend on the viability of one or more of the theories that the court has already explained do not entitle the Webbs to relief. Further, to the extent that the Webbs are seeking to quiet title to the property, their claim fails for another important reason: they do not allege that they have fully satisfied their obligations under the note, or that their debt was otherwise cancelled or forgiven. Instead, they appear to allege that they were not capable of paying the loan, and that this was true at the time they applied for it. (Compl. ¶ 48 (claiming that EquiFirst "qualified [plaintiffs] for a loan which EquiFirst knew or should have known [they] could not qualify for or afford.").)

As several other judges of this court have held, the failure of a plaintiff in a quiet title action to allege that he has rights superior to others asserting an interest in the property requires the claim's dismissal. *See, e.g., Blick,* 2012 WL 1030115, at *4; *Townsend v. Fed. Nat'l Mortg. Ass'n*, 923 F. Supp. 2d 828, 842 (W.D. Va. 2013); *Gallant*, 766 F. Supp. 2d at 719. *See also Tapia*, 718 F. Supp. 2d at 700 (dismissing quiet title claim where plaintiffs had not alleged that

they had fully satisfied their obligations under the note, or that their debt was otherwise cancelled or forgiven).

Like the plaintiffs in *Gallant*, the Webbs assert a right to quiet title in "a wholly conclusory fashion." *See* 766 F. Supp. 2d at 719. They have pleaded no facts that demonstrate that they have a superior title to the property at issue. Indeed, plaintiffs do not contend that they do not owe a debt to someone; they simply argue that they want "to make sure they were paying the correct owner of their loan." (Pl.'s Second Opp'n to Defs.' Mot. Dismiss 16, Dkt. No. 21.) They do not assert that they have satisfied the obligations that they admit to having, and they therefore fail to allege a superior interest in the property. Accordingly, the Webbs have failed to make allegations that would allow them to go forward with their quiet title claim.

The court will dismiss these three counts.

### 5. Violations of TILA, HOEPA, and RESPA (Counts 8 and 9)

The Webbs' allegations in support of their claims under TILA, HOEPA , and RESPA are likewise insufficient to state a claim for relief. The Webbs do not identify with any specificity at all what specific provision of these statutes were violated. And critically, they fail to point to a particular defendant who allegedly violated these statutes. The most specific of their allegations are that they were not provided a mortgage loan origination agreement and that none of the defendants "explained the workings of the mortgage loan transaction, how the rates, finance charges, costs and fees were computed [or] the inherent volatility of the loan product provided by [d]efendants." (Second Compl. ¶¶ 48–49.) They claim that the defendants violated TILA, for example, because defendants failed to provide them with "accurate material disclosures," including "fully inform[ing] home buyers of the pros and cons of adjustable rate mortgages in a language . . . that they can understand and comprehend and to advise them to compare a similar

20

loan products with other lenders." (Pls.' Opp'n to Defs.' Mot. Dismiss 9; *see also* Second Compl. ¶ 126.)

Given the lack of factual allegations against any particular defendant with regard to these claims, they, too, will be dismissed.

**6. Rescission (Count 10)**

The Webbs also seek the remedy of rescission—perhaps under TILA, although it is unclear from their complaint. To the extent they are seeking rescission under TILA, such claims are subject to a three-year limitations period, at best.[15] Here, the closing occurred in 2006, and the lawsuits were not filed until 2015. Although it is not required that the plaintiffs have actually filed a lawsuit seeking rescission within the three-year time frame, the borrower must notify his lender that she is exercising her right of rescission within that three-year period. *Gilbert v. Residential Funding LLC*, 678 F.3d 271, 277 (4th Cir. 2012). Critically, the Webbs do not allege that, at any point in 2009 or earlier, they sought the remedy of rescission from their lender—or from anyone, for that matter. Thus, it appears plain on the face of the complaint that any claim for rescission under TILA is time-barred.

Further, whether under TILA or otherwise, the "remedy of unconditional rescission [is] inappropriate" where the plaintiff is "unable to tender the loan proceeds." *Am. Mortg. Network, Inc. v. Shelton*, 486 F.3d 815, 821 (4th Cir. 2007); *Haas v. Falmouth Fin., LLC*, 783 F. Supp. 2d 801, 806 (E.D. Va. 2011) (noting that "[d]istrict courts in the Fourth Circuit following *Shelton* have routinely dismissed plaintiffs' rescission claims, both at the Rule 12(b)(6) stage and at summary judgment, where plaintiffs fail to allege or demonstrate they would be able to meet their tender obligation if rescission were ordered"). Here, the Webbs have not offered to tender back

---

[15] The three-year limitations period applies only if the lender fails to make certain disclosures. *See generally* 15 U.S.C. § 1635(f).

the full amount of their remaining loan obligation, nor have they included any allegations in their complaint suggesting that they have the ability to meet that tender obligation. Thus, their rescission claim fails for this additional reason. *Cf. Moore v. Wells Fargo Bank, N.A.*, 597 F. Supp. 2d 612, 617 (E.D. Va. 2009) (denying a motion to dismiss a claim for rescission where the plaintiff alleged that she would tender the loan proceeds and where she requested "reasonable time to make" the tender).

* * *

For the foregoing reasons, all of the Webbs' claims against U.S. Bank, MERS, and Aurora will be dismissed.

### D. Claims Against the Unserved Defendants

There is no evidence in the record that the Webbs have served any of the remaining defendants (EquiFirst and Does 1-100), and the time for doing so has passed.[16] Pursuant to the version of Rule 4(m) of the Federal Rules of Civil Procedure in effect when this case was removed, the court must dismiss the action without prejudice against any defendant that is not served within 120 days after the complaint is filed, or order that service be made within a specified time. Fed. R. Civ. P. 4(m). The rule requires the court to extend the period for service if the Webbs show good cause for their failure. *See id.* Likewise, the court has discretion under Rule 6(b) to grant an extension of time for service, if the Webbs could show excusable neglect. *See* Fed. R. Cir. P. 6(b).

In light of this background, the court will direct the Webbs to file a statement within thirty days setting forth any facts they believe show either good cause or excusable neglect for their failure to timely serve these defendants. The court points out, though, that they cannot rely on

---

[16] According to the notice of removal, EquiFirst went out of business in 2009. (Dkt. No. 1, ¶ 12.)

Case 7:15-cv-00413-EKD   Document 46   Filed 03/31/16   Page 22 of 23   Pageid#: 503

their pro se status to establish either. *See Hansan v. Fairfax Cty. Sch. Bd.*, 405 F. App'x 793, 794 (4th Cir. 2010) ("[p]ro se status . . . is insufficient to establish good cause, even where the pro se plaintiff mistakenly believes that service was made properly."); *id.* (quoting *McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary litigation should be interpreted so as to excuse mistakes by those who proceed without counsel.")); *Tann v. Fisher*, 276 F.R.D. 190, 193 (D. Md. 2011), *aff'd,* 458 F. App'x 268 (4th Cir.) (collecting authority).

## III. CONCLUSION

For the foregoing reasons, the court will grant the defendants' motions to dismiss (Dkt. Nos. 11, 25) and will dismiss all claims against MERS, U.S. Bank, and Aurora, each party to bear its own costs. The court will also allow the Webbs thirty days to provide a written explanation, if any, as to why the remaining defendants should not be dismissed without prejudice for lack of service. A separate order will be entered.

Entered: March 31, 2016.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge